The next argument is P.G. Publishing Company versus Carol Aicheleet. Mr. Frank? May it please the Court, Frederick Frank for the Pittsburgh Post-Gazette. I am requesting that I be allowed to have two minutes for rebuttal, Your Honor. Granted. Thank you, Your Honor. The issue before this Court is whether a 75-year-old statute creating a 10-foot zone around polling places, sporadically enforced, can override the sacrosanct freedom of the press in observing and recording the sign-in process of voters at the voter places. The Post-Gazette's challenge is to the constitutionality of the statute as applied to the media. It is not a facial challenge to the statute. The Post-Gazette has sought the most limited relief here, only to be able to observe and record during the sign-in process as voters come into the polling place, not to observe and record during the actual voting process. As this Court is well aware, there are two distinct rights established under the First Amendment. There is freedom of the speech and then there is freedom of the press. The two cannot be blurred. The tests for the two are manifestly different in a First Amendment challenge. The issue is the right to gather news. The type of forum is irrelevant in these cases because it is a question of gathering information. Who has the right to gather the news? The press does under the freedom of the press, Your Honor. Who's the press? The press is the recognized media who actually operate and have evidence that they are in operation as a representative of the media. Recognized by whom? Recognized by their operation in a fact-based determination that the Court could make at the time of a hearing here, Your Honor. But why isn't the press any person with a video camera? Are you suggesting that people who work for PG Publishing have a different right to bring in a video camera than a blogger? We believe that under the freedom of the press, a blogger could qualify as a member of the media here, Your Honor. So we're going to have potentially hundreds or thousands of bloggers into each polling location? If 100 bloggers acting in concert choose to exercise their right to bring in a video camera into polling station number 12, they have a constitutional right to do that? No, Your Honor, that would not result in having hundreds of members of the media in there at any one time. Why not? If they have a constitutional right to be there, then they have to be there. Because the Court in assessing and determining how the right of access of the media can set limitations on time, manner, and place. Like 10 feet away from the polling station? Not 10 feet away from the polling station, Your Honor, where that results in a bar of us being able to observe what is an admittedly public process, Your Honor, and to be able to record that. Voting is a public process? The sign-in process, Your Honor, is among the most public of processes. What Supreme Court case has held that the sign-in process at a voting station is a public process? I'm sorry, I didn't hear the beginning of your question. What Supreme Court case has held that the sign-in, as I understand the distinction you just made, you concede that voting is not a public process? The actual taking of the vote, that's right. In fact, you know, we all, that's one of the beauties of our system is we don't have the Gestapo leaning over our shoulder when we cast our secret ballots. Right. So you suggest that the check-in is a public process? Absolutely. What Supreme Court has held that? The United States Supreme Court has not addressed the issue. And what circuit court case has held that the check-in process at a voting station is a public process? The Beacon Journal case of the Sixth Circuit ruled in a much broader determination, Your Honor, that the media had the right to be in without limitation on the sign-in process. In facing precisely the same statute, virtually identical statute in Ohio, Your Honor, the Beacon Journal, in the Beacon Journal case, the Sixth Circuit held that the statute, that the burden was on the state to show that the statute was necessary to achieve the interest and was narrowly tailored to achieve that end. The Sixth Circuit said that the statute, which barred the media from coming in, the media's objective far from interfering with the right to vote is rather to report the news, specifically on the question Your Honor raised, Your Honor, about the hordes of reporters coming in. The Sixth Circuit said that that is purely hypothetical and cannot support the state's proposed restriction on the First Amendment guarantee that the state conduct shall not abridge the freedom of the press. They granted the media unrestricted access to the inside of the polling place. They did not limit it to the sign-in process, but certainly within that grant, the sign-in process was allowed. The Sixth Circuit concluded in granting that democracies die behind closed doors. Going back to your question, Judge Hardiman, we have an unusual factual situation here. We have an anomalous factual situation here in that the keepers of the sign-in process, those charged with seeing that it is appropriate, the Board of Elections in Allegheny County entered into and agreed to a consent order here that allowed the Post-Gazette in and granted it the rights that it decided. It voted to do so in its own vote. Can we stay with the first issue? I understand that's a second issue. Yeah. Perhaps you've concluded your argument on the constitutional issue. No, I'm not, Your Honor, if I may. Okay. Can we address the consent decree issue after you've concluded the constitutional issue? All right. All right. But I think that it is a – You made a powerful argument that the Sixth Circuit case controls. Are there any other case – not controls, obviously, but it should persuade us to do as the Sixth Circuit has done. Are there other courts of appeals cases that have told us whether the check-in process at the polling place is a public event? Well, the only case that went specifically to that issue is the Beacon Journal. I'd also – Let me ask you about Beacon Journal, and then we can talk about other cases since we're on Beacon Journal. In looking at Beacon Journal, it's in front of all of us, it's reasonable access to the polling place. And I guess let me start with where Judge Hardiman started, and that is, okay, if 10 feet isn't reasonable access, what is? I'm not arguing with you. I'm literally asking you what is. Okay. What is reasonable is to be able to be inside the polling place, Your Honor, and to observe the sign-in process with the voter ID law in Pennsylvania and the whole issue of who has the right to vote and whether they can be denied that right to vote under the Pennsylvania voter ID law and why they are denied that vote. Let's say this room was the polling place. Yes, Your Honor. Okay. You'd have – as I understand what the restriction is now, it would be 10 feet from that door, is that right? Yes, Your Honor. Okay, outside of the door. And we're not even allowed to photograph in from that 10 feet inside the polling place. And you do have access to anybody, to anyone, I should say, entering the room or exiting the room. From 10 feet, Your Honor. But that defeats, if I may – we do have that, Your Honor. But it defeats the ability of the media here to cover what is the most critical process, which is the sign-in, and under the voter ID law has a heightened public scrutiny, which is who is being allowed to vote and why are they being denied the right to vote under this law. And under the – in this election that is coming up, in the words of the Commonwealth Court, there is going to be a soft test of that voter ID law. People are going to be required to show their voter ID and a determination will be made, at least initially, whether that is going to be. And under the rulings of the Supreme Court of Pennsylvania, once we get past this election, in this particular – after we have the soft test here, in future elections there's going to be an absolute enforcement of the voter ID law inside the polling places. Now, the only way that the media can effectively report that and all the things that Globe newspapers and Richmond newspapers speak about, about the right of the media and the critical ability of it to serve, is to be able to observe the actual process, not with second-hand information that comes in. Second-hand information and coverage of that is effectively no coverage. We must be able to be present and observe and to be able to have our constitutional right to observe and report. There is no expressive issue before this court. And that is the – where the Commonwealth has gone. They've gone down a forum path. That is not what Globe newspapers and the progeny that come from it, specifically publicer of this court, you say you look to whether there is any secrecy involved. Who votes in Pennsylvania? It's among the most public information. So the Post-Gazette's interest is to make sure that everyone who is eligible to vote actually gets to cast a vote. In our coverage, absolutely. All right. And then obviously the people that I guess who have pursued these voter ID laws, they claim, who knows whether they're correct, but they claim that there is voter fraud occurring, correct? Correct. So they would have an equal and opposite interest in making sure that no fraudulent votes are cast, correct? The Post-Gazette's interest, Your Honor, I misspoke. I apologize. We are interested both in seeing that if, in fact, there is voter fraud and people who are voting improperly should not be voting. And we're also interested in also finding out if people are denied the right to vote. Both issues are important. All right. Then if both are important, then it would seem that if we rule your way, we're making every single polling place within the Third Circuit subject to photography, videography, et cetera. And, gee, isn't there a risk that that would have a chilling effect on some people? I mean, some people are camera shy. I mean, they don't have the opportunity to go in and say who they are and get a ballot and go exercise their constitutional right to vote without cameras snapping away at them or videographers sticking cameras in their faces. Your Honor. Isn't that the upshot of what you're asking us to do? First of all, under the consent order, Your Honor, and I do want to go back to that. No, no. I'm asking about the constitutional right, because if you have a First Amendment right to, quote, gather the news and go in there with cameras trained on every human being that walks in there, isn't that the upshot of the rule that you're asking us to stick? It is, Your Honor, what we are asking. Okay. But the Post-Gazette. It's a tall order. You can see. I mean, I know we're putting cameras in courtrooms, et cetera, and society is changing, but it is a tall order. The Post-Gazette has always been prepared in this matter to a reasonable restriction as to time and manner and place, Your Honor. And if in fact the court, I don't believe, Your Honor, that the disruption issue should be allowed to trump in its totality the First Amendment right of access and the critical right to be able to observe government in process. But there are a lot of government activities that you have no right to observe. Every municipal government in this county goes into executive session every month. You don't have a right to go in there. On a very limited basis, Your Honor. But this court in interpreting Glow has said that unless there is a tradition of secrecy of the underlying process, such as a grand jury investigation, or there is some national security matter, as was in the deportation hearing of the 9-11 terrorists, that the presumption is openness in government, Your Honor. Well, certainly trials. I mean, the trials have always been open, but voting has never been a public process, has it? Your Honor, as to who votes, as to who actually votes, not how they vote, it is the most public process. That's how people become super votes. That's how candidates are often criticized, Your Honor. But it's all public record who votes. That's right. So there's nothing secret about the process, Your Honor. Well, no, it's, well, okay. We'll hear you on rebuttal, Mr. Frank. Thank you. Mr. Marichle. Thank you, Your Honor. May it please the Court, Kamal Alexander Marichle for the Office of the Attorney General, representing the Secretary of State in this matter. The basic difficulty that exists with respect to the appellant's position in this case is that while the press, which now should be referred to as the media, I believe we're in an age where media is being redefined in ways that we haven't seen since journalism emerged out of London's coffeehouses in the 18th century. The media has a right to gather the news and publish that news. That is their right. But a long line of decisions of the United States Supreme Court that have provided great guidance to this circuit in the capital city's case make it clear that the media has no greater right of access in pursuit of that First Amendment right than is accorded to the general public. In other words, they do not have a special rogatory ability to go where no. If I were a citizen, I could walk into the polling place. Actually, you could not under our statute, which has been in effect for 75 years, unless you met one of the itemized categories. In the hypothetical that I gave to your adversary, I said this is the polling place. So I live in New Jersey. If this were the polling place, you're telling me I couldn't get through the door? Well, you certainly could get through the door, but at that point, you'd have to make it clear or someone, one of the members of the election board would need necessarily to find out if you were a voter, if you were intending to vote, if you were there to assist a voter, if you were. That's unlike any polling place I've seen. Couldn't I just get in line? When I got to the front, I'd say I'm from New Jersey. They'd say you're in the wrong place, but I've seen the process. Well, if you went into the line, you'd be in the line for people waiting to vote, which is one of the itemized presences. I'm only reacting to your statement that nobody else could come in here. Actually, that's true, Your Honor. If you look at 3060-D, things may be different in New Jersey. Things are different, I'm sure, elsewhere in the country. But the polling place in Pennsylvania under Rule 3060-D is, in fact, tightly restricted in terms of access. Now, obviously the problem, though, is, as Mr. Frank pointed out in the briefing, you know, it's county by county. It's polling place by polling place. It's polling place. Because there are polling places, I assume, with great confidence, where, you know, a pal of the judge of elections comes in with coffee and stands in the corner or sits there. And, you know, isn't that part of his argument, that this isn't policed properly? Well, that may be part of his argument, but part of his argument has always been an effort to try and create a straw man that he can conveniently sue for purposes of enforcement of the needs he seeks for his client. The fact is, as we've discussed in this brief as well, Pennsylvania has a bottom-up system of administering the elections. The judge of elections in Pennsylvania, every single precinct, every single ward, that judge is an independent constitutional officer who can only be removed by impeachment. Are they paid, by the way? They're paid. How much do they make? There's a particular statute that itemizes them. They're paid by the number of votes cast in the particular precinct. Is that how a district with 120 eligible voters gets 150 votes cast? I have no idea. Sounds like a perverse incentive. Well, it may be, Your Honor, but we're the Secretary of State. We certify elections. All right, so your argument is, yeah, the guy with the coffee is there. Who knows what goes on? It's not our fault. We're not responsible for those vagaries. You're washing your hands of that. Well, that's another point in this case. And you have the transcripts. You have the pleadings. You've read the briefs. But I'm not here to stand up and say that. I'm here to stand up and say that their First Amendment rights have not been violated. Please take a look at your Capital Cities case. Please take a look at another case. How is 3060-D enforced? 3060-D is enforced by 3060-F, which says the judges of elections are responsible for enforcing the provisions of 3060-D. How do we police the judges of elections? The judges of elections are capable of being policed in terms of the governor asking for their impeachment. They may also be policed through what I consider to be a legal fiction that emerged necessarily out of Pennsylvania case law in the early 20th century in which someone can go to a judge of the Court of Common Pleas and make a case for how they're behaving inappropriately. The Court of Common Pleas judge can then declare the office vacant because that person has disqualified themselves, and then they can have an ad hoc straw poll and put somebody in right there. Now, the judge of elections in enforcement is specifically provided in 3060-F with the ability to call upon police and other peace officers and constables to make sure that the restrictions on access to the polling place are enforced. Now, obviously, there are going to be vagaries and varieties of enforcement across the Commonwealth. In a system like that, which is managed by the very people in the very place, it's the most democratic system you could think of, where votes are being cast. These people are a little bit like district attorneys. They are, within a very limited geographic area, responsible for the enforcement of Pennsylvania state laws. And that's the system. Let me... What about the Beacon case? The Beacon case... If we follow it, are you in trouble? If we follow it, we're in trouble in a variety of ways because not only would we lose the case, but you'd be following a case that has no support in its own text, that has never been cited by anyone else in the eight years it's existed for that particular principle, that emerged out of a very hasty situation that we've demonstrated for you with no briefing and no argument. The primary point, which Mr. Frank alluded to, in Beacon Journal, is a citation to the Detroit Free Press versus Ashcroft. I beg your pardon. And in that case, they say democracy died behind closed doors. Well, isn't it interesting, I suggest, that that case is, in fact, the case that determined, in the Sixth Circuit, that the restrictions on access for special deportation hearings implicating terrorism and al Qaeda should not apply. And subsequently, your court in North Jersey Media Group versus Ashcroft at 308 Fed 2nd 3rd 198, in the same year, rejected Detroit Free Press versus Ashcroft. And you rejected it specifically in terms of your capital cities case. What is the test? The test, your case could not be more clear. It is very elegant. It is very effective. I suggest its test applies in this instance. First, is there a history and tradition of access to a particular place? If there's no history or tradition, we do not have the validation device of the judgment of experience. Polling places, there's no history or tradition. For the last 75 years, they've been, at least theoretically, I don't know what Ma Barker might do in some precinct in East Jabib, but as far as the law is concerned, they have been places of restricted access. So this is, your argument is this polling place in the room is not a public forum. Is outside the door a public forum? Outside the door is a public forum after 10 feet. And I want to say one more thing about that, Your Honor. That is that Mr. Frank, my learned opponent, I suggest is wrong in the sense that he says somebody couldn't stand at 10 feet and take a picture in. That's what they won in 2008 from the Court of Common Pleas of Allegheny County. The law is enforced in both directions. Did you say that's what they won or that's what they won? That's what they won. They won a decision that says the law falls fairly and applies to both sides. If they want to look in from 10 feet and they can take photographs from 10 feet, then they have a right to do that. That's never been set aside. That's Judge James's ruling, and it's in the briefs. So I don't know where they get that idea. I've never advocated it, and I don't know anyone who has. They have the right to serve. Well, if they're in a public place, they can behave like public people, which includes smart phones, cameras. They can do whatever they can do from 10 feet. So let me ask you this question. Again, this is the polling place. I'm an employee of the Post Gazette. I'm with two other people from the Post Gazette. I say, okay, we have to be 10 feet back. I mark off 10 feet. I say, okay, open up the doors. My two confreres open the doors. I can just snap away. Correct. Absolutely. The judge of election is going to let them just hold the doors open all day? I don't know. They might. In my precinct in Beachview, the doors are open. Yeah. It's an old school that's now a residence for elderly people as an apartment complex. And, you know, they use the old cafeteria. There's a hallway outside. There's a bake sale. You know, that kind of thing happens. Well, okay, let's get off the bake sale. Then I'm going to think about lunch. So assume for a moment that we find this to be a public forum. What's the level of scrutiny that we should apply? A public forum is subject to strict scrutiny. If it's a public forum, we lose. But no one has ever held clearly and unequivocally that it's a public forum, including Beacon Journal. Beacon Journal is very strange because it makes a reference to a United States Supreme Court case. And it's strange because it was started in the trial court on November 2nd, and it was ended in the Sixth Circuit on November 4th. So it's the biggest outlier of all time, I get it. Yes. But it does it much faster than what you've done to us here. Thank you, Your Honor. It wasn't meant to be a compliment. Well, my learned opponent and I have tried to be as comprehensive as we can in presenting our positions. We take our cases as we find them, I understand. Indeed. And we are happy to be here in that sense to have the final decision made. Well, on that topic, in light of what Mr. Frank referred to as the soft rollout or perhaps the state court referred to, do you need a decision between now and Election Day? Well, for one thing, this is a 12B6 motion. So even if you would reverse, you'd just send it back to the trial court, and it would go from there. He never sought a preliminary injunction. He never sought a TRO. So, you know, we're just reversing a dismissal of the complaint under 12B6, so there's not that far you could go. The other thing is, soft or not, that's exactly what happened up through September 17th, 2012, by the statute at any election that took place after the statute was enacted. For instance, last May, they asked if you would show your ID and made it clear that you didn't need to, but they were just doing a dry run for the next time. That's what I understand is going to happen this time. To get back to your capital cities case, the second prong is the purpose and function of the place where the access is purportedly restricted. In other words, would opening it up make it a better polling place? And that's where we go to the type of inquiry that Your Honor, Judge Hardiman, brought up. I mean, I think we would be in deeper First Amendment water if we start talking about the Post-Gazette is going to be licensed to go in, but Marty the blogger isn't going to be licensed to go in. He and Mr. Frank conceded that the bloggers are allowed in. I'm not sure that demarcates who the press is. I don't know who the media are or who the press are. My understanding was that the freedom of the press meant that any person that had the wherewithal to put something on paper, whether it be Poor Richard's Almanac or Common Sense or any other thing, could do so. I agree. Do you disagree? Not in the least. All right. So if we translate that into today's world, anyone who has a computer or a pencil or a paper or a camera, who has an interest in these matters of public import is the press or the media. Do you agree with that? I agree with that. Somebody who's a freelance writer. I think the bigger problem would be making distinctions among people of the media. I'm sure we could not do that. So actually, once somebody comes in with a pretension to gathering news, I mean, they... It's like one of those old hats with the... Didn't they used to wear a sign that said press card? Yes, it's a press card, yes. It's no longer that simple. And they don't use speed graphic cameras anymore. It's all much less colorful. But it's also, you know, CNN and all the different local news outfits all over the country say, you know, send in that shows a tornado or whatever. I mean, I don't see how you could make any sort of limitation. The purpose of the polling place is quite clear. The purpose is for secret ballot, which is in the Pennsylvania Constitution. Letting a lot of people in, including the media, is not going to effectuate that purpose. And then there's that California case, and I close on this. And that is a case where... You don't have to close, actually, but you can finish for the moment. Thank you, thank you. That's the Pontic Terra case where a poll watcher wanted to be able to come in and video people signing in. And the California Court of Appeals in the 4th District said that would fail even under strict scrutiny because it's at least conceivable that somebody would say, I don't want you to take my picture. And maybe the person would be too ambitious, or maybe they would be too pushy, or maybe they wouldn't hear them. And then there would be an argument. And then you'd have to go to the judge of elections or the minority clerk and say, this guy's trying to take my picture, and I said he didn't. You didn't tell me that I didn't, and I won't. This kind of argument and refereeing is going to be disruptive of the polling place. Burson, is that problematic to your public forum analysis? It's not problematic to my public forum analysis because it dealt with, in fact, a public forum 100 feet outside of a polling place under the Tennessee law. That swept broadly enough to touch sidewalks and streets, which are quintessential public forums. And considering where polling places are located all over the United States, other places of public gathering. So the question was, how would you justify this restriction? And the plurality in that case applied strict scrutiny to justify that restriction to electioneering. But Justice Scalia said he didn't think the sidewalks and so forth outside of a polling place were a public forum. And to make us all leave with our heads spinning, the Sixth Circuit, the same circuit that held in Beacon Journal that you should let the newspapers into a polling place, agreed with Justice Scalia in the city of Sydney case that the streets and sidewalks outside a polling place are not a public forum. I think they are a public forum, and I think they would be subject to strict scrutiny. But I don't see how Burson affects inside of a polling place. And I think 10 feet is tantamount to saying inside. Thank you, Mr. Rich. Thank you. I respectfully request you affirm on the basis of the comprehensive opinion of Judge Fischer. Thank you for your time. Thank you. Rebuttal, Mr. Frank? May I please report, Your Honor? We did ask for a preliminary injunction. That's in our pleadings, and I recited it at the time of the argument on the motion to dismiss. The facts of the history is unusual in that immediately after we filed, Judge Fischer scheduled a conference of the parties. It was announced there were going to be motions to dismiss filed, and she decided properly that she had to deal with the motion to dismiss before she could entertain anything further. So we never got that. The preliminary injunction. So I presume that if you prevail here, you're going to press for the preliminary injunction immediately. Yes, we would, Your Honor. What we are really pressing for is that we be allowed to have the consent order, which Allegheny County wanted to put in place here as the representative of the Board of Elections here, on a limited basis with various constraints upon the media in terms of what we can or cannot do. And what we're asking is at least preliminarily for this election, the consent order, which is the bottom-up person here in Allegheny County, said could be accomplished, wanted to have the media in. Judge Fischer refused to enter the consent order. She found it would violate state law. I understand that. You're quite right to say it's a little bit unorthodox for a court to not approve a consent order. Typically they're approved. But in order for that argument to carry the day, you need to persuade us why she was incorrect in her legal analysis that the decree would violate state law. What's your argument? Because, Your Honor, this court has said in the Samson case that one can get relief far beyond what you could achieve in the actual action, and said that even if the statutes wouldn't have permitted it, if the parties by consent, and particularly an agency exercising its discretion, wishes to do so, then you can grant. It can do more. But the fact that it can do more isn't the same as doing something that contravenes state law. Okay. What case says that a consent decree that contravenes state law needs to be entered? Well, that's what the Samson – well, it wasn't. It was federal. Of course, federal. Federal statute. That's exactly what the court said. It contravened it. They said you were getting far more relief than you could under the federal statutes here. So that's, in effect, a contravention, Your Honor. Well, it sounds supplementary more than in conflict with. Okay, Your Honor. But the point of the matter here is, if I can finish the question, even though my time is up, is that certainly the requirements of a consent order is that it be within the scope of the pleadings, Your Honor, and within the discretion of the government body, as you found in a case involving the Secretary of State extending, then the consent order can be entered. We have certainly raised an appropriate First Amendment, as applied to challenge here, that it would be within the confines of GLOBE and the other cases to find that the consent order is appropriate under the First Amendment rights of the media here, and that's what we're asking for here, Your Honor. Thank you, Mr. Frank. All right, thank you. Thank you, Mr. Frank. Mr. Marucci, the case was very well argued, and I, speaking for my colleagues, appreciate all the hard work you put into the case. I know you're under tight timelines and appreciate the high quality of lawyering. We'll take the matter under advisement.